# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-20105

United States Court of Appeals
Fifth Circuit

**FILED**

June 23, 2016

Lyle W. Cayce
Clerk

KEITH HARRIS,

Plaintiff–Appellee,

v.

HAROLD HAHN; JARVIS HOLLINGSWORTH; ROBERT JENKINS, JR.;
SADA CUMBER; CHRISTOPHER HUCKABEE; JACOB MONTY;
JANELLE SHEPARD; JOHN STEEN, JR.; DAVID TEUSCHER; RAYMOND
PAREDES; TILMAN FERTITTA; WELCOME WILSON, JR.; BETH
MADSON; SPENCER ARMOUR, III; ROGER WELDER; DURGA
AGRAWAL; PAULA MENDOZA; PETER TAAFFE,

Defendants–Appellants.

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge and CLEMENT and ELROD, Circuit Judges.
JENNIFER WALKER ELROD, Circuit Judge:

Keith Harris is a resident of Texas and an honorably discharged veteran of the United States Army. He challenges the constitutionality of the residency requirements in the Hazlewood Act, which provides tuition waivers at public universities for certain Texas veterans who enlisted in Texas or were residents of Texas at the time they enlisted. Because Texas has presented a rational basis for its residency-at-enlistment requirement and because Texas's decision to impose the condition on a portable benefit does not infringe Harris's right to travel, we reverse the district court's judgment.

No. 15-20105

## I.

The Hazlewood Act, first passed in 1923, allows certain classes of veterans to attend public universities in the state of Texas free of charge.[1] Tex. Educ. Code § 54.341. The Act grants qualifying veterans 150 hours of tuition-free credit at Texas's public universities, provided the veterans are not also receiving federal education benefits. *Id*. § 54.341(a)–(c), (e). In order for a veteran to qualify for benefits, the Act requires that the applicant:

> entered the service at a location in this state, declared this state as the person's home of record in the manner provided by the applicable military or other service, or would have been determined to be a resident of this state for purposes of [in-state tuition] at the time the person entered the service.

Id. § 54.341(a).[2] The Act only applies to veterans honorably discharged from the armed forces who served during any of a number of foreign engagements, including the Persian Gulf War and the conflicts against terrorism following the attacks of September 11, 2001. *Id*. § 54.341(a)(4)(E), (F).

Harris grew up in Georgia and enlisted in the Army at age eighteen in order to serve his country and support his family. At the time of his enlistment, he was a resident of Georgia. He served in the Army for four years and was honorably discharged in 2000. During his service, Harris served abroad in Korea and received several decorations.

After his discharge he returned to Georgia, married, and started a family.  In 2004, Harris moved to Texas. He expended his federal veterans' education benefits completing his undergraduate degree. In the fall of 2012,

---

[1] The Act's name honors Grady Hazlewood, a Texas State Senator who spearheaded a series of amendments in 1943 that greatly expanded the benefits offered under the Act. S. Comm. On Veterans Affairs & Military Installations, Interim Rep., 78th Leg. Interim Sess., at 6 (Tex. 2004).

[2] To qualify for in-state tuition, a person must have "established a domicile in this state not later than one year before the census date of the academic term in which the person is enrolled in an institution of higher education; and maintained that domicile continuously for the year preceding that date." Tex. Educ. Code § 54.052(a)(1).

No. 15-20105

Harris began law school at the University of Houston Law Center, where he is currently in his third year. The parties agree that Harris meets all of the qualifications for Hazlewood benefits other than the residency-at-enlistment requirement.

Harris applied for Hazlewood Act benefits and was denied on the basis of his enlistment in Georgia. He sued seeking declaratory and injunctive relief requiring the University of Houston to grant him a tuition waiver for his remaining semesters.[3] The district court granted summary judgment in Harris's favor. After comparing the Hazlewood Act to the statutes invalidated in *Zobel v. Williams*, 457 U.S. 55 (1982), *Hooper v. Bernalillo County*, 472 U.S. 612 (1985), and *Attorney General of New York v. Soto-Lopez*, 476 U.S. 898 (1986), the district court concluded that Texas lacked a rational basis for its fixed-point residency requirement.[4] The district court considered the Act "indistinguishable from the provision in *Soto-Lopez*," and therefore concluded that Texas lacked any rational basis for providing benefits only to veterans who were residents at the time of their enlistment. *Harris v. Cantu*, 81 F. Supp. 3d 566, 574 (S.D. Tex. 2015). The district court dismissed Texas's asserted interest in promoting education by creating an incentive for Texans to graduate from high school and enlist by observing:

> Promoting education plainly is a legitimate state interest, and by providing financial assistance for postsecondary education, the Act plausibly—albeit tenuously—encourages Texas high school

---

[3] Harris concedes that Texas's sovereign immunity prevents him from recovering in damages the tuition he has already paid to the University for the semesters that passed before he commenced his suit.

[4] Durational residency requirements are those that demand a person reside in a state for a given period of time before gaining benefits. Fixed-point residency requirements demand that at a legislatively determined moment (a specific date or event, for example, a veteran's date of enlistment) the applicant was a resident in the state. While an unsuccessful applicant can satisfy a durational residence requirement in the future, an applicant who fails to satisfy a fixed-point residence requirement cannot cure the defect with the passage of time.

3

students to graduate, join the military, and return to attend college and graduate school after exhausting their federal benefits. However, Plaintiff does not challenge the Act's provision of financial assistance, but rather its exclusion of Texas resident veterans who enlisted in other states, and Defendants do not explain how not providing benefits to veterans like Plaintiff furthers Texas's interest in its students' education.

*Id.* at 575 (citing *Soto-Lopez*, 476 U.S. at 909–10).

Because the district court determined the fixed-point residency requirement violated the Equal Protection Clause, the district court did not address whether it unconstitutionally restricted Harris's right to travel. The district court further determined that, under Texas law, the fixed-point residency requirement was severable from the remainder of the statute regardless of the additional costs because the fixed-point residency requirement could be removed from the statute without undermining what the district court saw as the statute's purpose: "reward[ing] honorably discharged qualified Texas veterans with educational benefits." *Id.* at 579.

For both its constitutional conclusion and its analysis on the question of severability, the district court relied on two opinions. The first, *Del Monte v. Wilson*, is a decision of the Supreme Court of California assessing the validity of a California statute conditioning certain veterans' benefits on residence in the California at the time of enlistment. 824 P.2d 632 (Cal. 1992). The second is an opinion of the Attorney General of Texas in response to a question about the Hazlewood Act. Tex. Att'y Gen. Op. No. DM-468 (1998).[5]

Texas appealed.

## II.

We review a grant of summary judgment *de novo*, applying the same legal standards used by the district court. *Apache Corp. v. W & T Offshore,*

---

[5] That opinion has since been withdrawn and the Attorney General has formally issued a new opinion reaching the opposite conclusions. Tex. Att'y Gen. Op. KP-0015 (2015).

No. 15-20105

*Inc.*, 626 F.3d 789, 793 (5th Cir. 2010). Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The questions presented here are purely legal as both parties agree on the relevant facts.

Harris argues that the Hazlewood Act infringes two constitutional provisions: (1) it denies him the equal protection of the laws as guaranteed by the Fourteenth Amendment; and (2) it violates his constitutional right to travel from one state to another. We examine each in turn.

**A.**

We begin with a brief discussion of Supreme Court precedent on state laws that distinguish between residents and non-residents. The Supreme Court has held that the Equal Protection Clause restricts the extent to which a state may discriminate between newly established and incumbent state residents in apportioning benefits. *See Saenz v. Roe*, 526 U.S. 689 (1999); *Supreme Court of Va. v. Friedman*, 487 U.S. 59 (1988); *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898 (1986); *Hooper v. Bernalillo Cty Assessor*, 472 U.S. 612 (1985); *Zobel v. Williams*, 457 U.S. 55 (1982).

At the same time, the Supreme Court has upheld benefits schemes based on residence when the benefit offered is a portable one that a non-resident could immediately obtain and take out of the state. *See, e.g.*, *Martinez v. Bynum*, 461 U.S. 321, 332–33 (1983) (upholding requirement that child's parents reside in and intend to remain in school district before allowing child access to tuition-free public schools); *Sosna v. Iowa*, 419 U.S. 393, 408–09 (1975) (upholding a durational residency requirement before allowing residents to petition for divorce in state courts); *Vlandis v. Kline*, 412 U.S. 441, 453–54 (1973) (acknowledging that "the state can establish such reasonable criteria for in-state [college tuition] status as to make

5

virtually certain that students who are not, in fact, bona fide residents of the State, but who have come there solely for educational purposes, cannot take advantage of the in-state rates."); *Starns v. Malkerson*, 401 U.S. 985 (1971) (affirming a judgment upholding Minnesota's residency requirement for tuition benefits); *see also Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 499 (10th Cir. 1998) (upholding preferential admissions to medical school for residents of New Mexico based on the duration of their residence in the state).

Even in decisions that ultimately overturned waiting periods or residency requirements, the Court has been careful to observe that states can impose certain residency requirements without constitutional impediment. *See, e.g.*, *Shapiro v. Thompson*, 394 U.S. 618, 638 n.21 (1969) (invalidating a one-year waiting period for public assistance while acknowledging the permissibility of "residence requirements determining eligibility to vote, eligibility for tuition-free education, to obtain a license to practice a profession").

Unfortunately, it is difficult to draw direct guidance from the decisions overturning state laws as unlawfully discriminatory against out-of-state citizens. These decisions lack a clear statement of rule and have often been fractured, with several justices concluding the programs violated the Equal Protection Clause, several justices concluding the programs violated the right to travel, and several justices concluding the programs violated no constitutionally protected rights.

Early cases assessing fixed-point residency requirements for public benefits addressed the statutes as potential violations of the Equal Protection Clause. *See Zobel*, 457 U.S. at 60 ("When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment."); *Hooper*, 472 U.S. at 618

(quoting the same passage from *Zobel*). Although later cases have considered a plaintiff's right to travel, some members of the Court continued to use the Equal Protection Clause as the correct framework for such challenges. *Soto-Lopez*, 476 U.S. at 913 (Burger, C.J., concurring) ("Because this case involves a distinction between residents based on when they first established residence in the State … we must subject this case to equal protection analysis." (internal quotation marks omitted)); *id.* at 916 (White, J., concurring) ("I agree with Justice O'Connor that the right to travel is not sufficiently implicated in this case to require heightened scrutiny."). In the three cases considering fixed-point residency requirements, the Court used rational basis review. *Zobel*, 457 U.S. at 60; *Hooper*, 472 U.S. at 618; *Soto-Lopez*, 476 U.S. at 904.[6] Therefore we do the same.

### B.

Harris contends that the distinctions made in the Hazlewood Act between resident veterans who enlisted in Texas or resided in Texas at the time of their enlistment and resident veterans of Texas who entered the armed forces elsewhere is irrationally discriminatory and violates the Fourteenth Amendment's guarantee of equal protection of the laws. The Equal Protection Clause provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The clause "does not forbid classifications" because "most laws differentiate in some fashion between classes of persons." *Nordlinger v.*

---

[6] The *Soto-Lopez* plurality suggested that the appropriate standard in *Hooper* and *Zobel* was strict scrutiny but that strict scrutiny was not necessary because the statutes in those cases also failed rational basis review. *Soto-Lopez*, 476 U.S. at 903–04. Only four justices, however, joined that plurality and supported the use of strict scrutiny in *Soto-Lopez*. Chief Justice Burger and Justice White regarded equal protection as the correct framework. *Id.* at 912 (Burger, C.J., concurring); *id.* at 916 (White, J., concurring).

*Hahn*, 505 U.S. 1, 10 (1992). "It simply keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Id.*

In cases that do not implicate suspect classes or fundamental rights, "[t]he appropriate standard of review is whether the difference in treatment between [classes] rationally furthers a legitimate state interest." *Id.* at 11. Statutory classifications are given broad deference under rational basis review and will survive "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993). Texas is under no obligation to prove its reasons; it need only offer them. "'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it' whether or not the basis has a foundation in the record." *Id.* at 320–21 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Classifications survive rational basis review "even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321.

Harris, arguing the Act lacks a rational basis, relies on a trio of Supreme Court cases addressing fixed-point residency standards. In *Zobel*, the Court considered whether an Alaska statute dividing oil revenues among residents based on the number of years of their residency in Alaska was constitutionally permissible. 457 U.S. at 56–58. The Court held that the tiered payment system based on years of residency lacked a rational basis and was impermissible. *Id.* at 65.

*Zobel* was quickly followed by *Hooper* and *Soto-Lopez*. In *Hooper*, the Court considered a New Mexico statute, passed in 1981, that provided property tax exemptions for veterans of the Vietnam War living in New

No. 15-20105

Mexico who had been residents on May 6, 1976.[7] *Hooper*, 472 U.S. at 616–17. New Mexico argued that the property exemption "encourage[d] veterans to settle in the State and . . . serve[d] as an expression of the state's appreciation to its 'own citizens for honorable military service.'" *Id.* at 618. New Mexico also suggested the statute "assist[ed] veterans who, as New Mexico citizens, were dependent on the State during a time of upheaval in their lives." *Id.* at 619 (internal quotation marks omitted). Because New Mexico set the fixed-point long after it had passed, the Court quickly dismissed the argument based on encouraging veterans to settle in the state. *Id.* The Court accepted that the second goal, honoring veterans for their service, was "plainly legitimate." *Id.* at 620 (adding "only recently, we observed that 'our country has a longstanding policy of compensating veterans for their past contributions by providing them with numerous advantages.'" (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 551 (1983))). New Mexico's statute failed rational basis review, however, because it did not "require any connection between the veteran's prior residence and military service." *Id.* at 622. A person who was born in New Mexico but left the state as an infant would be eligible for the benefit immediately upon his return while a veteran immigrating to the state immediately after his term of service ended in June 1976 would not.[8] The Court concluded that "[t]he State may not favor established residents over new residents based on the view that the state may take care of 'its own,' if such is defined by prior residence." *Id.* at 623.

---

[7] The tax exemption existed prior to 1981 with different residency restrictions. The fixed-point requirement was added in a 1981 amendment. *Hooper*, 472 U.S. at 614 n.2.

[8] The Supreme Court observed, in a footnote, that several courts had upheld Equal Protection challenges to statutes that, like the Hazlewood Act, conditioned benefits on residence in the state at the time of enlistment. Because the issue was not presented in *Hooper*, the Court made no determination on the validity of such benefit schemes. *Hooper*, 472 U.S. at 621 n.11.

No. 15-20105

The following term, the Court considered a New York law which gave hiring preferences for civil service positions to resident veterans who had resided in New York at the time of their enlistment. *Soto-Lopez*, 476 U.S. at 900. New York offered four justifications for its fixed-point residence requirement:

> (1) the encouragement of New York residents to join the Armed Services; (2) the compensation of residents for service in time of war by helping these veterans reestablish themselves upon coming home; (3) the inducement of veterans to return to New York after wartime service; and (4) the employment of a "uniquely valuable class of public servants" who possess useful experience acquired through their military service.

*Id.* at 909. Applying heightened scrutiny under the right to travel, four justices concluded other less restrictive means would accomplish the same end (for example, a statute with the same preference absent the fixed-point residency requirement). *Id.* at 910. Chief Justice Burger's concurrence, casting the decisive vote, argued heightened scrutiny was inappropriate and rested solely on the rational basis test. *Id.* at 914 (Burger, C.J., concurring).[9] Both opinions questioned New York's arguments that the benefit encouraged enlistment (because it applied to inductees as well as enlistees) or that it aided reintegration (because it was not tied to a veteran's length of service). *Id.* at 910; *id.* at 914 (Burger, C.J., concurring). The concurring opinion also found wanting the state's arguments that the preference encouraged veterans to settle in the state (because having the preference without the residence requirement would encourage even more veterans to settle) or that the preference targeted veterans with a particular combination of local

---

[9] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, J.J.)).

knowledge and military skills (because all current resident veterans would combine local knowledge with military skills). *Id.* at 914–15.

Harris, like the district court, also points to two sources—a decision of the California Supreme Court considering a California benefits scheme and a withdrawn opinion of the Texas Attorney General—that are not binding on this court and that we do not find persuasive. *Del Monte*, 824 P.3d 632; Tex. Att'y Gen. Op. No. DM-468. *Del Monte*, however, considered only California's argument that the law was tailored to minimize expenditures and that its purpose was to "compensate[] and provide[] assistance to those who were residents when they made the sacrifice of entering active military service." 824 P.2d at 639. This focus casts the statute in a retrospective rather than prospective view. California, unlike Texas, did not argue that the statute's purpose was to create an educational incentive for Californians considering enlistment.

Harris also relies on a 1998 opinion of the Attorney General of Texas. The Attorney General's opinion considered only the arguments California advanced in *Del Monte* to defend the scheme on the basis of financial stability. It did not consider Texas's argument that the Act incentivizes enlistment and graduation. The memorandum, therefore, does not assist us in weighing the defenses of the Act that Texas argues here. We generally give "careful consideration" to the formal opinions of state attorneys general on questions of state law. *Welmaker v. Cuellar*, 37 S.W.3d 550, 552 (Tex. App.—Austin 2001, pet. denied) (collecting cases); *see Stenberg v. Carhart*, 530 U.S. 914, 941–42 (2000) (according state attorney general the same weight given by the relevant state's courts on a question of state law). We need not do so here, however, because the 1998 opinion no longer reflects the views of the Attorney General. During the course of this litigation it was withdrawn and replaced with a new opinion concluding that the incentives created by the

No. 15-20105

Hazlewood Act do provide a rational basis for the distinctions created by the law. Tex. Att'y Gen. Op. No. KP-0015 (2015).

The current opinion of the Texas Attorney General does address the arguments raised in this case. After observing that the withdrawn opinion "dismiss[ed] all of the proffered state interests without discussion or analysis," the Attorney General noted that the Hazlewood Act, unlike the statutes in *Hooper*, *Zobel*, and *Soto-Lopez*, creates a prospective incentive. Tex. Att'y Gen. Op. No. KP-0015 at *2. It further argued that the Act reasonably limits the allocation of a portable benefit to those residents most likely to remain in Texas after graduation, thereby preserving the financial resources of Texas taxpayers and maximizing the returns to the local economy. The parties disagree on the level of deference owed to an Attorney General's opinion issued after litigation on the question has commenced. Because our independent analysis leads us to agree with the current opinion of Texas's Attorney General, we need not determine whether deference is required.

### C.

We now turn to Texas's defense of the Hazlewood Act. Texas advances several justifications in defense of the Hazlewood Act's fixed-residency requirement. Texas distinguishes the Hazlewood Act from the benefits offered in *Soto-Lopez*, *Hooper*, and *Zobel* because the benefits Texas offers are prospective. Therefore, Texas argues that the Act creates a prospective incentive that serves two state interests in education and security by encouraging Texas high school students to graduate (because graduation is a prerequisite to enlistment) and to enlist. Texas argues the benefit is tailored to those individuals most likely to stay in Texas after receiving an education at Texas's expense. These are valid bases for the Hazlewood Act and are distinct from those rejected in *Soto-Lopez*, *Hooper*, and *Zobel*.

No. 15-20105

First, unlike the benefits offered in *Zobel* and *Hooper*, Hazlewood Act benefits are prospective rather than retroactive. They accrue to the Texas resident not at a single legislatively determined point in the past but rather whenever she enlists in the armed forces, whether she did so in 1996, like Harris, or does so tomorrow. A Texas high school student today may decide to complete school and enlist on the promise of the future benefit offered by the Hazlewood Act.[10] In *Zobel* and *Hooper*, by contrast, the state picked a fixed point in the past, before the creation of the benefit, and tied benefits to residency at that moment. As a result, those legislative actions could have no incentivizing effect. *See Hooper*, 472 U.S. at 619 ("The legislature cannot plausibly encourage veterans to move to the State by passing such retroactive legislation."); *id.* at 623 (announcing its final holding, the Court said "[n]either the Equal Protection Clause, nor this Court's precedents, permit the state to prefer established resident veterans over newcomers in the *retroactive apportionment* of an economic benefit.") (emphasis added); *Zobel*, 457 U.S. at 65 ("The only apparent justification for the retrospective aspect of the program, 'favoring established residents over new residents,' is constitutionally unacceptable." (quoting *Vlandis*, at 412 U.S. at 450)). The district court erred by viewing the benefit retrospectively, as a reward offered for service, rather than prospectively, as an incentive offered to Texas students. Because the Hazlewood Act offers prospective benefits, it is not irrational for Texas to expect it to change the behavior of some Texans considering enlistment.

---

[10] Hazlewood benefits apply during periods of conflict recognized by the Texas Legislature. Such a period has existed since the attacks of September 11 and continues to exist today. Enlistment at any point will qualify a resident for benefits. If Texas chooses the close the conflict period that began with the attacks on September 11, 2001, prospective enlistees will have notice and may make a different decision.

No. 15-20105

Texas argues the prospective benefit advances two interests—education and security—by offering a benefit to residents considering enlistment. Texas has an obvious interest in encouraging its citizens to complete high school. *Brown v. Bd. of Educ. Of Topeka*, 347 U.S. 483, 493 ("Today, education is perhaps the most important function of state and local governments."). Because the military requires enlistees to obtain a high school diploma or equivalent, *see e.g.*, Army Reg. 601-210 (2–7), Texas can encourage students to complete their education by offering benefits to those students after their service is ended. Texas also has a rational interest in encouraging its citizens to enlist. Today's military is an all-volunteer force. *See* 50 U.S.C. § 3815(c); *Rostker v. Goldberg*, 453 U.S. 57 (1981). Because the military relies entirely on voluntary enlistment, Texas can promote national security by encouraging enlistment. By encouraging those who are willing to enlist, Texas can also reduce the possibility of conscription for other less willing Texans. When *Soto-Lopez* and *Hooper* were decided, many veterans had been drafted into service. The Court in both cases questioned the incentivizing effect of the challenged statutes because the statutes offered equal benefits to inductees and enlistees. *Soto-Lopez*, 476 U.S. at 910; *Hooper*, 472 U.S. at 614 & n.1. In the present day, without conscription, Texas can directly create an incentive for its citizens to enlist by offering them a benefit without any need to distinguish between enlistees and inductees.

Therefore, Texas has at least two rational bases for the residency requirement in the statute. Offering Hazlewood benefits to veterans who first enter Texas after completing their service would not advance either of these legislative interests. Although the district court was correct to observe that a state's financial interests alone may be an insufficient reason to separate potential beneficiaries, the state's financial interests are a sufficient reason to

14

limit a benefit to the cases in which the benefit actually serves Texas's interest.

Texas, unlike New Mexico, New York, and Alaska, does not rely on the state's interest in "taking care of its own" to justify the program. Rather, Texas advances the program as a means of incentivizing behavior taking place *before* entry into the military (finishing high school or the act of enlisting itself). The Supreme Court has made clear that a fixed-point residency requirement is highly suspect if the state's sole objective is rewarding past service. On the other hand, when the state's purpose is to encourage enlistment, a fixed-point residency requirement is perfectly rational. Offering benefits to non-Texans who enlist would not further Texas's interest in advancing the education or enlistment of its citizens. Such a gratuitous benefit would merely reduce the resources the state can use to achieve its educational goals. Texas need not explain, as the district court demanded, "how not providing benefits to veterans like Plaintiff furthers Texas's interest in its students' education." *Harris v. Cantu*, 81 F. Supp. 3d at 575. It is sufficient that Texas has a rational basis for offering benefits to Texas residents (promoting Texans' education and enlistment by Texans); that offering the same benefit to citizens who are residents of other states would not advance those interests; and that the financial burden of offering the benefit to residents of other states would reduce Texas's capacity to advance those same interests.

The fit between Texas's aims and the method used to obtain those aims need not be precise. "[E]ven if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by [the state] imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required.'" *Vance v. Bradley*, 440 U.S. 93, 108

No. 15-20105

(1979) (quoting *Phillips Chem. Co. v. Dumas Sch. Dist.*, 361 U.S. 376, 385 (1960)). We conclude that the Act has a rational basis.

## D.

Harris next argues that Texas's fixed-point residency requirement is an impermissible restraint on his constitutional right to travel and suggests that the statute must fail under the strict scrutiny applied to restrictions on that right. This argument rests on the plurality opinion in *Soto-Lopez* and on *Saenz v. Roe*, 526 U.S. 489 (1999). The district court, after concluding the Hazlewood Act failed under rational basis review, did not reach Harris's right-to-travel argument. *Harris v. Cantu*, 81 F. Supp. 3d at 574.

The Supreme Court has identified three components of the "constitutional right to travel from one State to another." *Saenz*, 526 U.S. at 498 (quoting *United States v. Guest*, 383 U.S. 745, 757 (1966)).

> It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

*Id.* at 500. The first element "may simply have been 'conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.'" *Id.* at 501 (quoting *United States v. Guest*, 383 U.S. 745, 758 (1966)). The second element derives from Article IV's Privileges and Immunities Clause. *Id.*; U.S. Const. art. IV, § 2 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."); *see also Paul v. Virginia*, 75 U.S. (8 Wall.) 168 (1868); *Corfield v. Coryell*, 6 F. Cas. 546 (Washington, Circuit Justice, C.C.E.D. Pa. 1823) (No. 3230). The third element of the right derives from the Fourteenth Amendment's Privileges and Immunities Clause. *Saenz*, 526 U.S. at 501; U.S. Const. amend. XIV, § 1 ("All persons born or naturalized in the United

States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ."); *see Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872). As in *Saenz*, if any element of the right to travel is implicated here, it is the third—the ability of a person to take up residence in a new state and be treated on an equal basis with previously established residents.[11]

The *Saenz* court defined this third prong of an individual's right to travel as "the right to be treated equally in her new State of residence."[12] *Saenz*, 526 U.S. at 505. California's law, which limited welfare benefits for new entrants to California, failed because it created a huge number of classifications. New residents from outside the United States or those who had not been on welfare in their prior state of residence received California's full benefits while each new entrant who had been previously enrolled received the benefits of his state of origin for a year before moving to the full benefits offered Californians. In effect, the statute created fifty classes of California welfare beneficiaries. *Id.* Because California argued only that the statute promoted financial stability in defense of its law, the Court concluded that the law was really erected "to fence out the indigent." *Id.* at 506 ("Neither the duration of respondents' California residence, nor the identity

---

[11] The Supreme Court did not expressly state the standard of review required when a state statute violates the right to travel. *Saenz*, 526 U.S. at 501–03. The Court's analysis of California's statute seemed to suggest that strict scrutiny would apply if the statute's purpose or effect was to create a disincentive to migration. *Id.* at 449. Because Plaintiff has shown neither that the Hazlewood Act was passed to create a disincentive nor that it has the effect of creating a disincentive, strict scrutiny is not demanded here.

[12] The dissenting Justices insisted the traditional understanding still held, namely, that "the right to travel clearly embraces the right to go from one place to another, and prohibits States from impeding the free interstate passage of citizens." *Saenz*, 526 U.S. at 511–12 (Rehnquist, C.J., dissenting).

of their prior States of residence, has any relevance to their need for benefits.").

Applying the standards described in *Saenz* to the Hazlewood Act, we are not persuaded that the Act implicates the right to travel because it imposes no penalty on new entrants to the state. Even assuming, *arguendo*, that the right is implicated, the residency requirement in the Act is justified because the benefit in question, unlike the benefits considered in other right to travel cases, is a portable benefit that can be received in Texas and enjoyed long thereafter if the recipient chooses to immediately leave the state.

The Hazlewood Act is distinguishable from the welfare schemes struck down in *Saenz* and *Shapiro* on several grounds. First, as Justice Stevens, the author of *Saenz*, observed in *Soto-Lopez*:

> A governmental decision to grant a special privilege to a minority group is less objectionable than a decision to impose a special burden on a minority. In a democracy the majority will seldom treat itself unfairly. In equal protection analysis, it is therefore appropriate to give some attention to the relative dimensions of favored and disfavored classes.

*Soto-Lopez*, 476 U.S. at 916–17 (Stevens, J., dissenting). This alone sets apart the Hazlewood Act, which provides a small number of Texans a benefit for which the vast majority of Texans will never qualify, from the scheme in *Saenz*, which set apart a small number of Californians as ineligible for a benefit all other Californians could obtain.

Second, the statutory schemes in both *Shapiro* and *Saenz* left new migrants in a worse position after entering their new homes than if they had remained in their prior states. The several statutes invalidated in *Shapiro* denied all benefits to new migrants for one-year (regardless of whether the migrant received benefits in his prior state of residence). *Shapiro*, 394 U.S. at 622–23. The California statute invalidated in *Saenz* offered new migrants the same payment they would have received in their prior state for their first

year in California before offering them the more generous support offered long-term California residents. *Saenz*, 526 U.S. at 493. As the *Saenz* Court observed, the high cost of living in California meant that most new migrants, offered the same nominal welfare payments, would have a decline in their quality of life. *Id.* at 494 n.2, 497, 506. By contrast, the new veteran migrant to Texas has lost nothing that he would have received in his prior state of residence because Texas is one of only two states to offer full tuition benefits to veterans.[13]

Finally, in both *Shapiro* and *Saenz* the Supreme Court held that the right to travel was infringed on the basis of lower court findings suggesting "exclusion from the jurisdiction of the poor who need or may need relief was the specific objective of these provisions." *Shapiro*, 394 U.S. at 628; *see Saenz*, 526 U.S. at 496–97. No such findings exist here, nor could they, for the immigrant veteran has lost nothing that he would otherwise have received in his prior state of residence.

Even if the Act did implicate the right to travel, Texas has offered a sufficient justification for the restriction. The benefit offered by the Act—a college education—is something the beneficiary can take out of state immediately after receiving. In short, unlike a job in the civil service or a welfare check, it is a portable benefit. The benefits offered in *Hooper*, *Soto-Lopez*, and *Zobel* were not portable. New Mexico's property tax exemption, employment in New York's civil service, and Permanent Fund distributions in Alaska could not be taken out of state when the resident beneficiary departed. Similarly the welfare payments offered in *Saenz* and *Shapiro* depended on continuing residence in the state. A cash payment, although it

---

[13] Only Illinois offers a comparable benefit. 110 Ill. Comp. Stat. 947/40. Georgia, Harris's residence at the time of his enlistment, does not offer full tuition discounts, limiting their veterans to $2,000 per year per deployment served for a maximum of $8,000 per year. Ga. Code Ann. §§ 20-3-485 to -87 (2008).

may be essential to the recipient, does not have the lifelong impact of a college education. The degree Texas offers is something a veteran will take with her for the rest of her life even if she departs from Texas immediately after her graduation. Differentiating between classes of residents in *Hooper*, *Soto-Lopez*, *Zobel*, *Shapiro*, and *Saenz* served no purpose because the benefit was coterminous with the residency. Texas, on other hand, is trying to safeguard its investment by restricting Hazlewood benefits to those individuals most likely to stay in Texas after graduation.

The Supreme Court has never invalidated a residency requirement attached to a portable benefit and has expressly reserved state's ability to restrict access to portable benefits. *See Sosna*, 419 U.S. 407–08; *Vlandis*, 412 U.S. at 453–54. In *Saenz* itself, the Court distinguished the California statute from tuition benefit programs like the Hazlewood Act by observing that:

> because whatever benefits [the plaintiffs] receive will be consumed while they remain in California, there is no danger that recognition of their claim will encourage citizens of other States to establish residency for just long enough to acquire some readily portable benefit, such as a divorce or a college education, that will be enjoyed long after they return to their original domicile.

526 U.S. at 505.

Finally, any incidental burden on the right to travel is lessened here because the benefit in question is purely a gratuity—Texas is under no constitutional obligation to provide any educational benefits to veterans. *Cf. Dunn v. Blumstein,* 405 U.S. 330, 339 n.8, 344 (1972) (invalidating waiting period on voter eligibility as infringement of right to travel because of voter protections in Fifteenth Amendment and Voting Rights Act).

Given the many distinctions between the Hazlewood Act's scheme and the statute rejected in *Saenz*, we decline to conclude that the Act infringes Harris's right to travel. To the extent Harris's right to travel is implicated, we

believe Texas is justified in tying the receipt of a portable benefit to residency. The Act suffers no constitutional infirmity.

## III.

Texas has provided reasonable justifications for the qualifications used in the Hazlewood Act to advance its interests in promoting education and military service. Our task only permits us to assess whether Texas exceeded its constitutional power when it included a fixed-point residency requirement in the Hazlewood Act not to opine on whether the limitation is wise as a matter of public policy. Without a clearer indication from the Supreme Court that Texas's decisions violate constitutional provisions, we are hesitant to impose further restrictions on the sovereign power of the State to regulate its own education system. We therefore REVERSE the judgment of the district court.